**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2000-KA-00310-SCT**

*ALVIN THOMAS, II*

*v*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/27/1999 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM C. STENNETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | JIM HOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/04/2002 |
| MOTION FOR REHEARING FILED: | 5/3/2002; denied 6/13/2002 |
| MANDATE ISSUED: | 6/20/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Alvin Thomas, II was indicted for the murder of William Powe. Following a trial in the Chickasaw County Circuit Court, Second Judicial District, the jury returned a verdict of guilty. On April 27, 1999, the Circuit Judge Henry L. Lackey sentenced Thomas to life imprisonment.

**FACTS**

¶2. This is the story of a lovers' triangle gone wrong. Tarnasha Bogan had alternately dated William Powe and Alvin Thomas. She dated Powe from 1992 to 1996. She dated Thomas from October 1996 to October 1997.

¶3. On the weekend of April 17-19, 1998, Bogan, Thomas, Daniel Pack, and Arlisha Nabors went to Memphis. When they returned to Okolona Sunday afternoon, they returned to Nabors's house, and Nabors and Bogan rode around. The two saw William Powe, and at Powe's request, Bogan called him later that evening at approximately 9 p.m. Powe picked up Bogan around 9:30 and took her to his mother's house. Bogan remained in the car while Powe went inside. While Bogan was waiting in the car, Thomas approached. Powe returned to the car to see Thomas standing beside it. Bogan testified that Thomas said "What's up Powe?" and then she heard a gunshot. She did not see the gun. She testified that she did not see Powe make any move toward Thomas. She said that Powe "was just standing there" when Thomas shot him. Thomas then fled on foot. Officers arrested Thomas around 10 p.m.

¶4. Thomas was indicted for Powe's murder. At trial, Thomas testified that Powe had previously made threats against him. He further asserted that on the night of the shooting, he had seen something shiny in Powe's pocket and that Powe's hands were in his pockets. Thomas alleged that it was common knowledge around town that Powe carried two guns. The case was submitted to the jury, and it rejected his self-defense argument, by returning a guilty verdict. Thomas was thereafter sentenced to a term of life imprisonment.

## DISCUSSION

### I. WHETHER THE COURT ERRED IN ORDERING THAT THE JURY VENIRE BE DRAWN FROM BOTH THE FIRST AND SECOND JUDICIAL DISTRICTS OF CHICKASAW COUNTY AND IN ALLOWING THE VENIRE TO BE DRAWN IN AN IMPROPER MANNER.

¶5. Chickasaw County contains two circuit court districts. Thomas's venire was initially to be drawn from the second. The District Attorney moved the trial court to order the jury venire be drawn from both the first and second districts. The trial judge granted this motion, and the jury was drawn from both. Thomas filed a motion to quash the jury venire, and this motion was denied. He tells us that the District Attorney's motion basically argued that he was unhappy with some of the results he had received in criminal trials and that the District Attorney wanted to have the first judicial district included because the jurors would "likely be familiar with the District Attorney and his family." However, a review of the motion defies Thomas's rendition. The District Attorney's motion stated that "due to the small size of the jury pool and small geographic area, most of the members of every jury venire impaneled in the last few years know the defendants through kinship, friendship or family ties. As a result of the juror/defendant familiarity, it has become extremely difficult to pick a fair and impartial jury for trials held in the second judicial district." The trial judge agreed. He said:

> Heretofore, the Court has had a lot of difficulty in obtaining a jury because of the, because there is a small jury pool because many of the jurors were related to each other. Many of the jurors were related to criminal defendants, and it was difficult to obtain a jury, particularly in a capital case where it's a well publicized case and where the State as well as defendant would get 12 peremptory challenges. For that reason the Court ordered the clerk to draw the jury venire from both districts; therefore, the motion of the defendant to quash the jury venire is overruled.

¶6. Thomas also informs us that this motion was filed and entered on an ex parte basis. The trial judge acknowledged this during the course of pre-trial motions and said: "It is factual that there was no notice given to any defense counsel that I'm aware of ; that this was discretionary with the Court." However, this is not the basis for Thomas's assignment of error. Instead, Thomas argues that this order violated the fundamental principles of due process of the Sixth and Fourteenth Amendments of the United States Constitution, as well as, the public policy of this State.

¶7. Miss. Code Ann. § 13-5-21 (Supp. 2001), which governs the method for drawing a jury when a county contains two circuit court districts, states:

> In counties where there are two (2) circuit court districts, the jury commission shall make a list of jurors for each district in the manner directed for a county, and the same shall be treated in all respects as for an entire county. In such counties a juror shall not be required to serve out of his

district, *except should the court, in its discretion, otherwise direct*, and except when drawn on a special venire. In either of such excepted cases, the jury shall be drawn from the two (2) jury boxes if the court so direct, one (1) name for each alternately.

(emphasis added). Thomas claims that drawing the venire from both districts violated Miss. Code Ann. § 13-5-2 (Supp. 2001), which provides:

It is the policy of this State that all persons selected for jury service be selected at random from a *fair cross section of the population of the area served by the court*, and that all qualified citizens have the opportunity in accordance with this chapter to be considered for jury service in this State and an obligation to serve as jurors when summoned for that purpose. A citizen shall not be excluded from jury service in this State on account of race, color, religion, sex, national origin, or economic status.

(emphasis added). He claims that because the public policy in this State is for the jury to be selected from the area served by the court, public policy was violated because the trial court did not serve the entire Chickasaw County population. He refers to *Avery v. State*, 555 So. 2d 1039 (Miss. 1990) (overruled on other grounds), in which this Court stated that although the provisions for jury selection are merely directory, "courts must make every reasonable effort to comply with the statutory method of drawing, selecting, and serving jurors. The jury system must remain untainted and beyond suspicion." *Id.* at 1044.

¶8. We have already found that § 13-5-21 "meets the vicinage requirements of the Sixth Amendment." *Myers v. State*, 353 So. 2d 1364, 1368 (Miss. 1978). "[T]he statutory method of selecting jurors is directory, not mandatory, and unless it is shown that the method used was fraudulent or such a radical departure from the method prescribed by statute as to be unfair to the defendant or the prevent due process of law, this Court will not reverse." *De La Beckwith v. State*, 707 So. 2d 547, 597 (Miss. 1997). *See also Tanner v. State*, 190 So. 2d 670, 672 (Miss. 1966). Thomas asserts that the process was flawed because "the jurors in the Second Judicial District were picked from a list of potential jurors that included all the last names beginning with the letter A through J, but the list for the First Judicial District was drawn from names beginning with the letters from A - W." However, an examination of the order explains why this is so:

IT IS THEREFORE ORDERED that the Circuit Clerk of Chickasaw County shall draw 100 names alternatively from the first judicial district and 100 names alternatively from the second judicial district of Chickasaw County. The Circuit Clerk may use the first 100 names of the 150 jurors she has already drawn for service from the second judicial district.

It can hardly be said that this was a radical departure from our statute. Accordingly, this assignment of error is without merit.

¶9. Thomas next directs our attention to the United States Supreme Court's decisions in *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In *Taylor*, the Supreme Court held that the Sixth Amendment right to a trial by an impartial jury of the State and District wherein the crime shall have committed, requires that the jury be drawn from a fair cross section of the community. *Taylor*, 419 U.S. at 531. *Duren* took this one step farther and outlined a three-part test for establishing a prima facie violation of the fair-cross-section requirement. The defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the

representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren*, 439 U.S. at 364.

¶10. As to the first prong, in *Duren*, the Supreme Court found that its previous decision in *Taylor* had "without doubt established that women 'are sufficiently numerous and distinct from men' so that 'if they are systematically eliminated from jury panels, the Sixth Amendment's fair-cross-section requirement cannot be satisfied."*Duren*, 439 U.S. at 364. Although we have no statistical data for the racial composition in Chickasaw County, to hold that this element has not been satisfied defies common sense. Elaborate and comprehensive data as to this one element is unnecessary. The United States Supreme Court, long ago, said that "[t]o exclude racial groups from jury service [i]s said to be 'at war with our basic concepts of a democratic society and a representative government.'" *Taylor*, 419 U.S. at 527 (citing *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940)).

¶11. As to the second prong, "the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement."*Duren*, 439 U.S. at 364. Thomas fails on this prong. He asserts only that "the Houston District of Chickasaw County is majority white. The Okolona District is majority African-American." This simply does not meet the rule annunciated by the Supreme Court. Consequently, Thomas's challenge is without merit.

¶12. Lastly, the third prong. Thomas was required to show "that the underrepresentation of [African-Americans], generally and on his venire, was due to their systematic exclusion in the jury-selection process." Thomas asserts that this is established because (1) the District Attorney added more individuals to the venire from the district that was predominantly white, and (2) the District Attorney used 22 challenges for African-Americans. As previously stated, Thomas has produced nothing to establish the racial composition of the two districts. Further, this does not satisfy the requirement of the systematic exclusion of African-Americans in general. The Supreme Court has defined systematic as "inherent in the particular jury-selection process utilized."*Duren*, 439 U.S. at 366. In stark contrast, the appellant in *Duren* was able to show "a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year."*Id.*

¶13. Finally, Thomas stresses that the resulting jury was composed of 9 white jurors and 3 African-American jurors. However, the Supreme Court in *Taylor* made clear, that "in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." *Taylor*, 419 U.S. at 537. Accordingly, this assignment of error is without merit.

### II. WHETHER THE COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO QUASH THE JURY PANEL MADE UNDER *BATSON V. KENTUCKY*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

¶14. "On review, a trial court's determinations under *Batson* are afforded great deference because they are largely based on credibility." *Puckett v. State*, 788 So. 2d 752 (Miss. 2001) (citing *McGilberry v. State*,

741 So. 2d 894, 923 (Miss. 1999); *Coleman v. State*, 697 So. 2d 777, 785 (Miss. 1997)). "This Court will not reverse factual findings relating to a *Batson* challenge unless they are clearly erroneous. *Id.*

¶15. "Under *Batson*, a defendant must show that (1) he is a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges to excuse a venire person of the defendant's race; and (3) that there is an inference that the venire persons were excluded on account of their race." *Collins v. State*, 691 So. 2d 918, 926 (Miss. 1997). The record reflects that the trial judge did not make a definitive ruling on whether Thomas had established a prima facie case. Instead, he reminded counsel for Thomas that something had previously been said about a *Batson* challenge. Thereafter, counsel for Thomas objected to all of the State's challenges, and the State offered race neutral reasons for each. At the conclusion, the judge overruled Thomas's objections.

¶16. In *Collins v. State*, 691 So. 2d 918 (Miss. 1997), we recognized that "[t]he United States Supreme Court has held that 'once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.'" *Id.* at 926 n.3 (quoting *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)). "The 'pivotal inquiry then is whether the State was able to present a race-neutral explanation for each of the peremptory strikes.'" *Collins*, 691 So. 2d at 926 (quoting *Griffin v. State*, 607 So. 2d 1197, 1202 (Miss. 1992)). "Determining whether there lies a racially discriminatory motive under the State's articulated reasons is left to the sole discretion of the trial judge." *Id.* (citing *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987)). Herein lies the essence of Thomas's argument. He raises no objection to the State's explanations being facially race-neutral, however, he argues the trial court's determination never delved into the question of intent. Specifically, he asserts that after the trial judge determined that the reasons offered were facially neutral, he never considered whether the State's proffered reasons were, in actuality, a pretext.

¶17. Thomas's reliance on *Robinson v. State*, 773 So. 2d 943 (Miss. Ct. App. 2000), is misplaced. In *Robinson*, the State used 7 of its 12 challenges to exclude African-Americans. The trial court found that Robinson established a prima facie case and ordered the State to give its reasons for striking the jurors. *Id.* at 947. The State gave facially race neutral reasons and the defense was given an opportunity to respond. *Id.* However, the trial judge believed that his *only* decision was to determine whether the State had given race neutral reasons for the challenges. *Id.* at 949. "The trial court failed to consider the second, and more subjective, aspect of ruling on whether or not the State's challenges were racially motivated." *Id.* This is the identical argument Thomas now presents to us. Thus, a review of the arguments is necessary.

¶18. The State challenged Desmon D. Gordon based on information from the county attorney that he was not coherent and that his competency was questionable. This was similar to information provided to the State by Powe's (the victim's) family. The State also asserted that it was questionable whether he was able to read and write. Thomas's rebuttal was that Gordon had an eighth-grade education, that he could evidently read and write, and that he had never said he could not read and write.

¶19. The next challenge was for Evelyn Gates. The State said that she had heard about the case and she had personally had "lots" of civil lawsuits filed against her. There was no rebuttal from Thomas.

¶20. Billy Fields was challenged because he said he knew the defense attorney. The State was apparently unsatisfied with Fields's answers when he was questioned as to how well he knew the defense attorney because the State argued that "based upon his reaction, there appears to be some admiration or something

for defense counsel. I was just basing that on his reaction when asked about Mr. Shelton." Counsel for Thomas responded that only thing he remembered Fields saying was that he had seen Shelton's name in the paper. The State then added that Fields was from a high crime and high drug area. When the trial judge asked if there was anything further from the defense, counsel for Randall said "no, sir."

¶21. Warzella Gillespie was challenged because she failed to answer a question about her family members having been in trouble with law enforcement. The State then asserted that law enforcement said she "had had some problem with law enforcement." Gillespie was also alleged to be a friend and classmate for a witness for Thomas. There was no rebuttal from Thomas.

¶22. Henry L. Conway was alleged to have "contacts" with different members of the victim's family. The State also argued that Conway already knew both sides of this case and that he appeared to want to be on the jury. Because of this, the State "felt he was dangerous. For that reason we felt like he had some predisposition. We don't know what it was." There was no rebuttal from Thomas.

¶23. The State challenged Wesley L. Gillespie, Jr. because he failed to list any educational level on his juror information sheet. Additionally, the State asserted that both the victim's family and law enforcement had said that he "may be slow intellectually and unable to follow the evidence and easily influenced." The State also argued that its search in the justice court revealed that Gillespie had several civil suits filed against him, as well as several indictments. There was no rebuttal from Thomas.

¶24. The State's proffered reason for challenging Ezekiel Gillespie was that "the law enforcement indicated that he had just problems; that he and his family have had problems with the law; and that for that reason they felt like he might be biased against law enforcement; and in conferring with the victim's family, they felt like he was someone who might lean to the defendant in this case." There was no rebuttal from Thomas.

¶25. The State next challenged Dennis Tucker. Tucker said that although he had read about this case, he had not formed an opinion and felt like he could be fair. The State said that although they felt he was positive as a juror, "the family of the victim was not comfortable with him; and they knew him, felt like he would lean to the defendant." There was no rebuttal from Thomas.

¶26. The State challenged Adella Doss because she failed to acknowledge that her son had been indicted twice on two different cases. The State asserted that its "investigation" led them to believe that she is biased against law enforcement and would not be fair to law enforcement in this case. The State supported this belief by adding "when she was asked in all sort [sic] of ways to answer the question about family member who have been indicted, she did not respond in any way to that." There was no rebuttal from Thomas.

¶27. Elizabeth Banks was challenged because she was related to an individual who had been indicted and was, at that time, a co-defendant of an individual represented by counsel for Thomas. The State also asserted that her husband had been prosecuted, yet she failed to answer the question regarding relatives who had been prosecuted. There was no rebuttal from Thomas.

¶28. Marilyn Devauld was an alternate juror, and she was challenged because she said she could not be fair. She knew Thomas's family. There was no rebuttal from Thomas.

¶29. The trial court then discussed each challenged juror individually and ruled that all of the reasons given by the State were race neutral. However, as to two of the individuals challenged, the trial judge ruled that the State's reasons were race-neutral for purposes of peremptory challenges, but not the for cause

challenges.

¶30. The factor clearly missing from the **Batson** hearing was rebuttal by counsel for Thomas. Thomas never raised any type of pretext argument before the trial judge. After the State offered its reasons for the challenges, counsel for Thomas, for the most part, said nothing. The State reminds us of **Chisolm v. State**, 529 So. 2d 625, 639 (Miss. 1988), in which we stated, "[I]t [i]s incumbent on [the objector] to come froward with proof when given the opportunity for rebuttal." *See also* **Berry v. State**, 703 So. 2d 269, 296 (Miss. 1997) (Mills, J.,dissenting) ("If the defendant makes no rebuttal the trial judge must base his decision only on the reasons given by the State."); **Bush v. State**, 585 So. 2d 1262, 1268 (Miss. 1991)).

¶31. Indeed, the present case is very similar to **Chisolm**. We held that the defendant in **Chisolm** clearly established a prima facie showing. **Chisolm**, 529 So. 2d at 638. At the conclusion of the prosecutor's arguments, the defendant failed to offer any proof. **Id.** At the close of the hearing, defense counsel simply gave the following statement: "The Defendant would object that the District Attorney has arbitrarily excluded blacks peremptorily, using the reason on several jurors that they were unemployed. The Defendant feels that that is tantamount to excluding them for their race in this case." **Id.** We found that "his statement was an ineffective as it was conclusory." **Id.** In the case sub judice, defense counsel's only argument was that "The State, all their challenges were of the black race. We feel that was purposely done to get a white jury, and it certainly was to prejudice the defendant in this case being tried by a jury of his peers." Accordingly, the "conclusory" statement by Thomas is as ineffective as it was in **Chisolm**.

¶32. Thomas urges us to find that, at least with regard to Billy Fields, the justification offered by the State is "implausible or fantastic." **Purkett v. Elam**, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). As a reminder, Fields was the juror who knew of counsel for the defendant in this case, Jimmy Shelton. Thomas n tells us that "Jimmy Doug Shelton, as a leading plaintiff's attorney in northeast Mississippi, advertises heavily throughout the area. It would be much more surprising if the jurors had not heard of him." When Fields was asked if he knew the defense attorneys, he said: "Yeah, I know them." When he was probed as to how he knew them, he responded: "I just know them from living on the edge of Lee County, and I see their names in the paper." He then said that this would not prevent him from being fair and impartial. However, this knowledge alone was not the only reason the trial judge found the State had offered race neutral reasons for his challenge. The court's ruling on Fields reads as follows:

> Number 15, Billy Fields, Jr., Mr. Fields *also appeared to be somewhat intellectually challenged*. When he was responding to the questions, he said he knew him, he said he had heard about him in the newspaper; and for that reason I think that would be a reason that the State could challenge him on race neutral grounds.

(emphasis added). The trial court's finding with regard to Fields was not clearly erroneous, and, consequently, this argument is without merit.

¶33. "As in any equal protection case, 'the burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'" **Batson**, 476 U.S. at 93 (quoting **Whitus v. Georgia**, 385 U.S. 545, 550, 87 S.Ct. 643, 646-47, 17 L.Ed.2d 599 (1967)). "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." **Purkett v. Elam**, 514 U.S. at 768, 115 S.Ct. at 1771. Thomas's rebuttal to the State's reasons was minimal *at best*, and predominantly nonexistent. Because Thomas failed to offer any proof, the State's reasons for the challenges were the only facts before the trial judge. Reviewing the trial

court's findings with the great deference to which it is entitled, we conclude that this assignment of error is without merit.

### III. WHETHER THE COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION FOR MISTRIAL WHICH WAS BASED UPON PRE-TRIAL JUROR CONTACT BY A MEMBER OF THE ALLEGED VICTIM'S FAMILY

¶34. Thomas next asserts that he was denied a trial by an unbiased jury because a relative of the victim was seen "fellowshipping" with members of the venire. During the pretrial motions, the State moved ore tenus for an order that would "prevent the defendant, his family, or any of his witnesses [from] having contact with the jurors." The trial judge noted that this was already proscribed by our rules[1] and said that he would instruct them as such. The following day, the defendant's mother and father, Mary and Alvin Thomas, Sr., alleged that Thomas Guido was "fellowshipping" with the potential jurors. Guido is married to the victim's "mother's daughter."[2] "He was also a supervisor in Chickasaw County and was a man of some influence in the black community." The trial judge allowed the defendant to present the testimony of Mr. and Mrs. Thomas in support of this assertion. The court overruled Thomas' motion for the time being and said: "All right. Court will attempt to cover this on voir dire; and we'll pass this threshold when the jury is chosen." Without a single citation to the record and without a single citation of legal authority (not even to Rule 3.06), Thomas now tells us that this "give[s] this Honorable Court substantial reasons that this conviction should be overturned." This Court disagrees.

¶35. In *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818 (Miss. 1992), we reiterated "the long honored principle that '[w]hatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions." *Id.* at 820 (quoting *Lee v. State,* 226 Miss. 276, 286, 83 So. 2d 818, 821 (1955)). This Court takes allegations of jury tampering very seriously. *Robinson v. State*, 662 So. 2d 1100, 1104 (Miss. 1995). However, as the State points out, the testimony of Mr. and Mrs. Thomas established merely that they alleged Guido was "fellowshipping" with the venire. Neither of them heard anything that was said.

¶36. Subsequently, during voir dire, the following exchange occurred between defense counsel and venireman Henry Conway:

Q. Do you know Mr. Thomas Guido?

A. Yes, sir.

Q. Have you had a chance to talk to him about the case?

A. No, sir.

Q. And when's the last time, if you would, you spoke to him?

A. Thomas Guido?

Q. Uh-huh.

A. Do I remember talking to Thomas Guido about the case?

Q. I'm talking about anything.

A. It's been sometime. He's come to the church in which I pastor. We've probably talked about something else. I don't think it was dealing with any of this.

Defense counsel then asked if any other members of the venire knew Guido. Several jurors said they knew him. The State is correct that defense counsel never asked them if they had spoken to Guido that morning.

¶37. Thomas also asserts that "the trial court should have taken every means at its disposal to ensure that the defendant received a fair trial." The record reflects that the trial judge told the bailiff to "instruct [Guido] for the Court that he is to have no contact with any of the jurors whatsoever, not to speak to them or not to nod to them or shake their hands or anything; and that comes from me, not from me, but that's from the Court . . . if he violates that, you let me know." This occurred the day after the trial judge gave the standing order that no one was to have contact with the potential jurors. He then allowed Thomas to question both Mr. and Mrs. Thomas about the alleged "fellowshipping."

¶38. Thomas's allegation is both in poor taste and unfounded. Thomas has provided us with nothing to establish that any of the jurors acknowledged having spoken with Guido that morning. Conway was the only juror who was even asked whether he had spoken to Guido about the case. Additionally, Thomas has provided us with nothing to demonstrate that his jury was anything but unbiased and uninfluenced by Guido or any other outside factor. Thomas's assertions are not to be taken lightly, but the burden is upon him to provide us with a record of facts sufficient to support this claim. Without more, this is merely speculation. "We may not speculate upon nor consider matters not in the record." *Johnson v. State*, 475 So. 2d 1136, 1142 (Miss. 1985). Accordingly, this assignment of error is without merit.

### IV. WHETHER THE COURT ERRED IN GRANTING THE STATE'S MOTION IN LIMINE WHERE DEFENSE COUNSEL WAS PROHIBITED FROM INFORMING THE JURY THAT THE DEFENDANT WOULD BE SUBJECT TO MANDATORY LIFE IN PRISON IF CONVICTED

¶39. The State moved in limine to prevent Thomas from informing the jury that if he was convicted he would receive a mandatory life sentence. Thomas responded by arguing that the legal authority provided by the State was inapplicable to his case. The trial judge granted the State's motion. Thomas later requested that the court allow him to inform the jury during opening statements that if he was convicted he would receive a mandatory life sentence. His motion was overruled. Thomas now asserts this was erroneous and that he "should have been allowed to inform the jury of the mandatory sentence."

¶40. Again, Thomas provides us no citation to any legal authority. He argues only that "it has been a set rule in prior cases in which there was a mandatory sentence, for counsel to inform the jury of the mandatory sentence." He asserts that the jury cannot make an "enlightened" decision if they are not aware of the sentence.

¶41. The State provides us with legal support for the cases where we have held it was improper for the *prosecutor* to argue before the jury in terms of a *potential* sentence. For example, in *Marks v. State*, 532 So. 2d 976, 983 (Miss. 1988) (citations omitted) we said that "[w]e have consistently disapproved of arguments which refer to the *potential* sentence in a given case." In *Marks*, the prosecutor's argument regarding the different sentences the defendant would face was used to urge the jury to convict him of murder instead of manslaughter. We observed, "The problem with arguments such as these is that they

invite the jury to convict with regard to the punishment, not with regard to the evidence before them, and the jury should have no concern with the quantum of punishment to be imposed." *Id.* (citing *Abney v. State*, 123 Miss. 546, 86 So. 341 (1920)).

¶42. The problem in the case presently before us is that Thomas did not face potential sentences. If the jury found him guilty, he was statutorily mandated to be sentenced to a life term. We have recognized a defendant's "right" to inform the jury of his sentence only during the sentencing phase of a capital murder trial. *See Ladner v. State*, 584 So. 2d 743 (Miss. 1991);*Turner v. State*, 573 So. 2d 657 (Miss. 1990) (holding that due process requires the trial judge to inform the jury that defendant's habitual offender status makes him ineligible for parole *during the sentencing phase of trial*).

¶43. The admissibility of evidence is within the discretion of the trial judge. *Crawford v. State*, 754 So. 2d 1211, 1215 (Miss. 2000) (citing *Wade v. State*, 583 So. 2d 965, 967 (Miss. 1991)). We will not reverse unless this discretion is abused. *Id.* (citing *Lewis v. State*, 573 So. 2d 719, 722 (Miss. 1990)). The trial judge ruled that Thomas's sentence was irrelevant and said: "Court is of the opinion that what type of sentence is given the defendant is immaterial. It's whether he's guilty or not, and that's the only thing that [the jury] should be concerned about and are to be concerned about. If he's not guilty, then find him not guilty. If he is guilty, find him guilty; and the Court will take care of the sentencing in that regard." The trial judge did not abuse his discretion by prohibiting Thomas from mentioning the mandatory sentence during opening statements. The mandatory life sentence was not relevant to the jury's determination of Thomas's guilt. Consequently, this assignment of error is without merit.

### V. WHETHER THE COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR DIRECTED VERDICT, BOTH AT THE CLOSE OF THE STATE'S CASE AND THE CLOSE OF THE ENTIRE CASE

¶44. In his next assignment of error, Thomas appears to be arguing that his motions for a directed verdict and for JNOV should have been granted because his claim of self-defense somehow negated that State's evidence or somehow rendered it legally insufficient. This argument is without merit. We have stated:

> In appeals from an overruled motion for JNOV the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. *Esparaza v. State*, 595 So. 2d 418, 426 (Miss. 1992); *Wetz* [*v. State*, 503 So. 2d 803, 808 (Miss. 1987)]; *Harveston v. State*, 493 So. 2d 365, 370 (Miss. 1986); *May v. State*, 460 So. 2d 778, 780-81 (Miss. 1984); *Callahan v. State*, 419 So. 2d 165, 174 (Miss. 1982). The credible evidence consistent with [Thomas'] guilt must be accepted as true. *Spikes v. State*, 302 So. 2d 250, 251 (Miss. 1974). The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn form the evidence. *Wertz* at 808. *Hammond v. State*, 465 So. 2d 1031, 1035 (Miss. 1985); *May* at 781. Matters regarding the weight and credibility of the evidence are to be resolved by the jury. *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984); *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980). We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Wertz* at 808; *Harveston* at 370; *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985).

*McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993).

¶45. Thomas was convicted of murder, defined by Miss. Code Ann. § 97-3-19 as:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

(a) When done with deliberate design to effect the death of the person killed, or of any human being.

¶46. Thomas goes through great detail in discussing the elements of self-defense, both actual and constructive. He put on proof to establish his claim. However, the jury, as the ultimate finder of fact, was not obligated to accept Thomas's theory of the case. The jurors were obviously not persuaded. Thomas argues that the victim was known to carry a gun. However, the testimony at trial established that he was not armed at the time Thomas shot him. Thomas also argues that the testimony of his witnesses established that the victim had threatened him on previous occasions. However, the testimony of the State's witnesses established that there were no offensive or defensive injuries on the body of the victim, and that on the way to the jail Thomas told a police officer that "he basically got [Powe] before William Poe got him." Accordingly, this assignment of error is without merit.

### VI. WHETHER THE COURT ERRED IN DENYING DEFENDANT'S PROPOSED JURY INSTRUCTIONS, D-14, WEATHERSBY RULE INSTRUCTION, AND D-15, A SUPPORTING SELF-DEFENSE INSTRUCTION, AND D-6, EXCUSABLE HOMICIDE INSTRUCTION

¶47. The standard of review for challenges to jury instructions is as follows:

[T]he instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case. *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000)(citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)(citations omitted)).

*Woodham v. State*, 779 So. 2d 158, 163 (Miss. 2001).

¶48. Thomas first complains of the trial court's refusal of D-14, which reads as follows:

You are instructed that because the defendant was the only eye-witness to the alleged shooting, his version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by credible witnesses for the State or by facts of common knowledge.

¶49. Thomas correctly states that this is derived from our decision in *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933). He further directs our attention to *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989), where we reaffirmed the *Weathersby* rule and said "the *Weathersby* rule is simply a statement of a well-recognized principle of law that where the defendant's, and sole eyewitness's, version of a slaying is uncontradicted, reasonable and credible, it must be believed. And, if such version creates an absolute legal defense, he is entitled to a directed verdict of acquittal."

¶50. However, the State correctly argues that "[t]he *Weathersby* rule ... is not a jury instruction but a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict." *Blanks v. State*, 547 So. 2d at 34; *Griffin v. State*, 495 So. 2d 1352, 1355 (Miss. 1986); *Harveston v. State*, 493 So. 2d 365 (Miss. 1986). Consequently, this assignment of error is without merit.

¶51. Thomas next complains of refused D-15, which states:

> You are instructed that the Defendant in order to establish that he acted as reasonably appeared to be necessary for protection of his life, need not show that the deceased had a weapon in his hand, or in sight, or said anything at time [sic] shot was fired, were [sic] deceased hade previously threaten [sic] the Defendant, had been known to carry a weapon, and immediately prior to shooting hade been with Defendant's girlfriend, and hade approached the Defendant in a threatening manner.

¶52. Thomas argues that this proposed instruction mirrors our decision in **Lomax v. State**, 205 Miss. 635, 39 So. 267 (1949). The trial judge refused this instruction because he believed that the jury would be fairly instructed by all of the instructions as a whole. The State argues that the jury was adequately instructed by the instructions as a whole and that this particular instruction would have resulted in the trial judge improperly commenting on the facts before the jury. This Court agrees. The trial judge gave D-7, which was a comprehensive self-defense instruction, DE-4A and D-8, which were both self-defense instructions, and S-3, which was also a self-defense instruction. These combined instructions adequately informed the jury as to Thomas's claim of self-defense. Consequently, this assignment of error is without merit.

¶53. The last refused instruction of which Thomas complains is D-6 which would have instructed the jury as follows:

> The Court instructs the jury that the killing of any human being shall be excusable when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation.
>
> In this case if you shall find from the evidence, or have a reasonable doubt therefrom, that Alvin Thomas in the heat of passion, upon a sudden and sufficient provocation by William Poe, fired a weapon and said weapon accidentally and/or through misfortune killed William Poe, it is your sworn duty to acquit Alvin Thomas.

¶54. Thomas argues that under **Day v. State**, 589 So. 2d 637 (Miss. 1991), this instruction was warranted. Specifically, he asserts that in accordance with **Day**, this instruction "should have been given to the jury to decide what constitutes accident or misfortune or sudden and sufficient provocation."

¶55. The State correctly argues that a necessary component of "heat of passion" is "a state of violent and uncontrollable rage." **Mullins v. State**, 493 So. 2d 971, 974 (Miss. 1986). In the case before us, there was no testimony presented about "a state of violent and uncontrollable rage." Thomas's testimony was that Powe came out of his house with his hands in his pockets. Thomas alleged he saw something shiny in Powe's pocket. Thomas also alleged that Powe said "I told you what I was going to do to you," and that Powe pushed him. Thomas drew out his weapon and it "was fired." The shot scared him, so he started running up the street and dropped the gun. This is insufficient to support a claim for heat of passion. The trial court cannot give an instruction for which there is no evidentiary basis. **Smith v. State**, 572 So. 2d 847, 849 (Miss. 1990). Consequently, this assignment of error is without merit.

## VII. WHETHER THE COURT ERRED IN DENYING DEFENDANT'S POST-TRIAL MOTIONS

¶56. Thomas's last assignment of error is that juror Stacey Caples withheld information and made material representations of fact, revealing undisclosed bias on behalf of this juror. In support, he refers us to the

following quotation from *Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990):

> We need be clear about the nature of the Odom rule. It imports an objective test: in the face of a clearly worded question propounded on voir dire examination, one that bears relevance to the case in bar, has the juror withheld substantial information or misrepresented material facts? Voir dire examination is often the most crucial crucible in forging our primary instrument of justice; the fair and impartial jury. Like a fine suit of clothes, a jury must be tailored to fit, and court and counsel examine prospective jurors under settled rules tending toward that fit. When offering challenges for cause and challenges peremptory, parties and their lawyers must rely on the objective candor and responsiveness of prospective jurors, and nothing turns on who asks the question, so long as it was clearly worded. *See* ***Brown v. State***, 529 So. 2d at 539; ***Caldwell v. State***, 381 So. 2d at 592. Following a jury's verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and failing that, we must reverse on appeal. We presume prejudice. Where, as a matter of common experience, a full and correct response would have provided a basis for a peremptory challenge, not rising to the dignity of a challenge for cause, our courts have greater discretion, although a discretion that should always be exercised against the backdrop of our duty to secure to each party trial before a fair and impartial jury.

¶57. Thomas asserts that Stacey Caples had a relationship with the victim, William Powe, and that she failed to disclose this during voir dire. The following is the voir dire between the State and Stacey Caples of which Thomas now complains:

Q. Anybody else know the defendant or know the defendant's family?

A. (Ms. Stacey Caples raised her hand.)

Q. Yes, ma'am.

A. (Ms. Stacey Caples) I went to high school with both of them.

Q. Ms. Caples, you're saying you went to school with both of them, the victim and the defendant.

A. (Ms. Stacey Caples nodded her head up and down.)

Q. Do you, by that relationship of having known both of them and going to school, would that affect your ability to be fair and impartial?

A. (Ms. Stacey Caples) No.

Q. You can set that aside.

A. (Ms. Stacey Caples nodded her head and up down [sic].)

Q. Were you closer friends with one than the other?

A. (Ms. Stacey Caples) No.

Thomas asserts that he had witnesses ready to testify that Caples and the victim were seen together on several occasions and that it was "almost an open secret that the two were carrying on." Thomas asserts the trial court committed reversible error when it refused to allow him to call Staples to the stand to testify about this alleged relationship.

¶58. The record reflects that the trial judge allowed Thomas to present the testimony of five individuals to attempt to establish that Caples and the victim had been involved in a sexual relationship. When Caples took the stand to testify, the State objected. The trial judge sustained the objection and said:

> Court's of the opinion that the motion should be and is hereby sustained. Under Rule 606 of the rules of evidence it is not proper for the Court to allow an inquiry into the validity of a verdict or indictment unless and until the person bringing the motion has passed that threshold of producing competent testimony or evidence that some extraneous material or information was before that jury that influenced that juror.
>
> I'm of the opinion that every witness that we have heard-I have viewed the witnesses by watching them very closely. I've observed their testimony and their appearance on the stand; and everything that I've heard is hearsay, conjecture; and I'm of the opinion that it would be sustained.
>
> I haven't heard a witness testify on behalf of the defendant that I thought was believable . . . and for that reason I'm going to sustain the objection of the State; and I'm going to release Stacy Caples at this time from the subpoena issued by the defendant and find that it was improper to inquire into this according to our rules . . . .
>
> The record will reflect that the court on its own motion from the bench released the juror from the subpoena finding that it would be improper to subject this juror to an investigation based upon the testimony and evidence that's before the Court at this time.

¶59. Defense counsel had the opportunity to ask follow-up questions during voir dire, but failed to do so. Additionally, the trial judge did allow Thomas a hearing on his motion regarding Stacey Caples. The trial judge rejected the testimony as unreliable and conjecture. After a review of the testimony, this Court agrees. Consequently, this assignment of error is without merit.

## CONCLUSION

¶60. Thomas's assignments of error are without merit. Therefore, the judgment of the Chickasaw County Circuit Court is affirmed.

¶61. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL PAY $248.00 COURT COSTS; 2% BOND FEE; $100 TO THE VICTIM'S COMPENSATION FUND AND OTHER CONDITIONS.**

> **PITTMAN, C.J., WALLER, COBB, EASLEY AND CARLSON, JJ., CONCUR. DIAZ, J., CONCURS IN RESULT ONLY. McRAE, P.J., AND GRAVES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**

1. Uniform Circuit and County Court Rule 3.06 provides that "Jurors are not permitted to mix and mingle

with the attorneys, parties, witnesses and spectators in the courtroom, corridors, or restrooms in the courthouse. The court must instruct the jurors that they are to avoid all contacts with the attorneys, parties, witnesses or spectators."

2. Additionally, the victim's mother and the defendant's mother are half-sisters. "They have a common parent, but [defendant's mother] is not related to Mr. Guido. [Mr. Guido] married into the [victim's] family."